ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
NOV 5 2007
U.S. COURT OF FEDERAL CLAIMS

**LOUISE HALL and GLENN GOULD,**

**Plaintiffs,**

**v.**

**UNITED STATES OF AMERICA** **No** 07-773 L

**Defendants.**

**COMPLAINT**

COME NOW Plaintiffs, Mary Louise Hall and Glenn Gould, by and through their undersigned attorney, and hereby state their complaint against the Defendants as follows:

**INTRODUCTION**

1. This case asserts the taking of private property by the United States of America California Bureau of Land Management Ridgecrest Field Office ("BLM") through its "Adopt-a-Cabin" program. The name of the program has subsequently been changed to the Historic Cabin Site Stewardship program. On November 3, 2001, the BLM signed a Memorandum of Understanding ("MOU") pursuant to the Adopt-a-Cabin program, incorporating into the program the physical structures currently owned by Plaintiff Glenn Gould, located on the Silver Swan unpatented mining claim owned by Plaintiff Mary Louise Hall. The MOU also stated that the Silver Swan mining claim was not an active mining claim and that there is no mining claimant.

2. By virtue of including the unpatented mining claim in the Adopt-a-Cabin program, the BLM effectively denied Plaintiff Mary Louise Hall access to her Silver Swan mining claim for mining purposes, allowed the public to trespass on the claim, and allowed the public to remove her mining equipment and minerals and gemstones more fully described below.

3. The BLM has failed to follow regulations with regard to allowing public access to unpatented mining claims resulting in a taking of the claims and property related to the claim.

4. By virtue of including the physical structures on the Silver Swan mining claim in the Adopt-a-Cabin program, the BLM denied Plaintiff Glenn Gould the use of his structures, allowed the public to trespass in the structures, and then took no action to notify the public that these structures were not public property even after the BLM acknowledged that the Silver Swan mining claim and structures should never have been included in the Adopt-a-Cabin program in the first place.

5. The BLM failed to follow the proper agency procedures for "taking" private structures on unpatented mining claims.

6. By including the Silver Swan mining claim and structures in the Adopt-a-Cabin program, and by failing to notify the public of its error once the BLM determined that the property should not have been included in the Adopt-a-Cabin program, the United States of America, BLM took Plaintiffs' private property without due process and just compensation in violation of the Fifth Amendment of the United States Constitution.

## JURISDICTION AND VENUE

Jurisdiction by this Court is invoked pursuant to the following:

7. Title 28 U.S.C. § 1491 specifically provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . ." See 28 U.S.C. 1491(a)(1).

8. The Fifth Amendment of the United States Constitution.

9. Venue by this Court is invoked pursuant to the following: the United States Court of Federal claims is the exclusive forum for Fifth Amendment claims over $10,000. See 28 U.S.C. § 1491(a)(1).

## PARTIES

10. The Plaintiffs in this lawsuit are Mary Louise Hall and Glenn Gould. Mary Louise Hall ("Hall") is the owner of the Silver Swan unpatented mining claim, claim # CAMC 49332, located in Inyo County, CA. This area is known as the Talc City Hills. Hall's unpatented mining claim was for silver, gemstones, clay, marble, talc and "rare earth minerals."

11. Hall is also the owner of the following mining equipment that was removed from the property by the BLM "volunteers" when Hall's valid unpatented mining claim was included in the Adopt-a-Cabin program. Such equipment and minerals generally includes, but is not limited to, the following:

   A. Steel welded bat cages and locks from mining tunnels and mining shafts. These cages and locks were placed on the opening to the mine to stop private trespass on the property;

B. Mining shaft and tunnel shoring;

C. Equipment and supplies for full production jewelry and sculptures;

D. Mineral beads and findings;

E. 400 pounds of cut and polished gemstones, 200 pieces of finished gemstones and beaded jewelry, one ton of slabbed and blocked onyx, 20 marble tabletops, additional marble and soapstone sculptures;

F. One small trencher, one gasoline engine concrete mixer, 2,500 gallon water storage tank, 4-55 gallon barrels for water storage, batteries and generators, solar panels, three ore carts and tracks, stone setting and jewelry making equipment, saws used for quarrying stone, various sized core drills, other additional equipment related to mining, and mineral product finishing.

12. Plaintiff Glenn Gould ("Gould") is the owner of the following structures located on the Silver Swan mining claim:

A. One 1500 square foot stone house, unfurnished, with an additional attached garage and covered porch;

B. One separate 736 square foot stone and cement garage;

C. One tool house approximately 100 square feet;

D. One 221 square foot cabin with attached garage of 190 square feet;

E. One 273 square foot storage shed.

13. The use of the structures by Gould has been "taken" through the BLM's inclusion of them in the Adopt-a-Cabin program. Once the structures were included in

BLM's program, Gould was no longer legally able to exclude the public nor the BLM employees from entering his property.

14. The public/BLM also removed Gould's roof from the 1500 square foot stone home. The structures have been so badly damaged and vandalized now that the Department of the Interior intends to destroy them.

15. The Defendant is the United States of America, Bureau of Land Management, a governmental agency, within the Department of the Interior. The BLM is charged with the management of federal lands including those lands upon which the Silver Swan unpatented mining claim and related equipment and Gould's structures are located. As an agency responsible for the management of federal lands, the Bureau of Land Management is charged with the duty of following and implementing the U.S. Constitution and other federal laws and regulations governing the use of these lands.

## LEGAL BACKGROUND AND REQUIREMENTS

16. The Mining Law of 1872 provides that "[t]he locators of mining locations . . . situated on the public domain, their heirs and assigns . . . so long as they comply with the laws of the United States . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations . . . ." See 30 U.S.C. § 26. This right is limited to uses by the claimant which are "reasonably necessary to the legitimate operation of mining." Teller v. United States, 113 F. 273, 280 (8th Cir. 1901).

17. The United States Supreme Court has held that a mining claim on public lands is a possessory interest in land that is mineral in character. Best v. Humboldt

Placer Mining Co., 371 U.S. 334, 335-336 (1963), citing, Cameron v. United States, 252 U.S. 450, 456 (1920). Failure to carry a mining claim to patent does not result in a loss of the claim. Id. at 336. Owners of unpatented mining claims hold fully recognized possessory interests in their claims. U.S. v. Locke, 471 U.S. 84, 103 (1985).

18. For an individual to establish a property interest in an unpatented mining claim, there must have been an administrative determination by the Department of the Interior that the mining claim is valid, supported by a discovery of a valuable mineral deposit. Bush v. U.S., 58 Fed. Cl. 123, 125 (Fed. Cl. 2003), citing, United States v. Coleman, 390 U.S. 599, 602 (1968).

19. In 1955, Congress passed the Multiple Use Mining Act, 30 U.S.C. § 601 *et seq.*, also known as the Surface Resources Act ("Act"), which states that mining claims located under the mining laws of the United States "shall not be used, prior to issuance of a patent therefor, for any purposes other than prospecting, mining, or processing operations and uses reasonably incident thereto." See 30 U.S.C. § 612(a). This section of the Act simply restated that law as it had existed prior to 1955. Mary Louise Hall, IBLA 2004-204 (2004).

20. The Act also contains a section which provides the Federal Government with the authority to retain and manage the surface resources on any mining claims located after 1955. California Costal Commission v. Granite Rock Co., 480 U.S. 572, 582 (1987); see also, 30 U.S.C. § 612(b).

21. Owners of claims located prior to 1955 "gained the exclusive right of possession and enjoyment of the surface of the claim." Nevada Pacific Mining Co., 164 IBLA

383, 384 (2005); see also, Talache Mines v. U.S., 218 F.2d 491, 500 (9th Cir. 1955); U.S. v. Langley, 587 F. Supp. 1258, 1263 (D.C. Cal. 1984) (Claimants whose claims were located prior to 1955 have the right to exclude the public from the claim.)

22. In 1976, the enactment of the Federal Land Management and Policy Act ("FLPMA") imposed a duty upon the Secretary of the Interior to prevent unnecessary or undue degradation of the public lands. See 43 U.S.C. §§ 1732(b), 1740. This led to the enactment of 43 C.F.R. Subpart 3809 which requires mining claimants to file a notice of intent to mine for operations which were more than "casual use." See 43 C.F.R. §§ 3809.1-3. "Casual use" is defined as "activities ordinarily resulting in no or negligible disturbance to the public lands or resources." See 43 C.F.R. § 3809.5. The regulations did not require a claimant to notify the BLM of any new or existing structures on such mining claims. Bruce W. Crawford, 86 IBLA 350, 388-89 (1985).

23. In 1996, the BLM issued regulations at 43 C.F.R. Subpart 3715 which require claimants to notify the BLM of occupancies on mining claims and require that any occupancy of the mining claim must be considered reasonably incident to mining. See 43 C.F.R. § 3715.0-1 *et seq.* Regardless of whether the mining operations required a mining plan or notice of intent to mine, or involved only casual use, claimants are required to file information to justify the occupancy of the claim. See 43 C.F.R. §§ 3715.3, 3715.3-2. Procedurally, when claimants are not in compliance with 43 C.F.R. Subpart 3715, the BLM is to issue a notice of non-compliance ("NONC") requiring corrective action in compliance with

Subpart 3715, a cessation order ("CO") requiring all use and occupancy of the premises to cease until there is compliance with Subpart 3715, or the BLM may order an immediate suspension of all use and occupancy of the claim until such time as compliance with Subpart 3715 is achieved. See 43 C.F.R. § 3715.7-1.

24. Under 43 C.F.R. § 3715.5-2, property which is left behind on public lands becomes the property of the United States after ninety (90) days, provided compliance with the applicable laws described above. See 43 C.F.R. § 3715.5-2; see also, BLM Manual H-9232-1. The BLM Manual requires the BLM to post notice when valuable personal property is left on public lands rather than simply "taking" the property. See BLM Manual H-9232-1.

25. The BLM's "Adopt-a-Cabin" program was:

> started in 1989 when BLM and a group of concerned citizens agreed on a plan to repair historic cabins once used by ranchers and miners in Southern California. BLM provides the materials and volunteers provide the labor. About 37 cabins in remote and often inaccessible areas have been identified for adoption under this program operated out of the BLM's Ridgecrest Field Office in California; almost half have actually been adopted. Today a dedicated group of volunteers mostly from Southern California take great pride in restoring these historical treasures of the great outdoors.
>
> See Bureau of Land Management Volunteer Feature, available at, http://www.blm.gov/volunteer/feature/2003/ca/ (Last visited on October 25, 2007).

26. It appears that the authority for such program comes from the FLPMA, 43 U.S.C. 1701 *et seq.*, and 43 C.F.R. Subpart 3715.

## FACTUAL ALLEGATIONS

### I. Allegations as they pertain to Plaintiff Hall

27. Plaintiff Hall purchased the Silver Swan mining claim in 1993.[1] At the time she purchased the claim, she also acquired the structures, including a house, a garage, three (3) sheds, and two (2) additional structures located on the property.

28. At the time the structures were acquired in 1993, their presence could be justified only if they were "reasonably incident to mining." However, under the Mining Occupancy and Use Regulations, 43 C.F.R. Subpart 3809, unless the mining on the property exceeded "casual use," the claimant was not required to notify the BLM of mining activities on the property. These regulations allowed Hall's structures to be present on the unpatented mining claim.

29. In 1996, the BLM issued regulations under 43 C.F.R. Subpart 3715 which required Hall to notify the BLM of the extent of her occupancy of the structures and to establish that such occupancy was "reasonably incident to mining." "Occupancy" encompassed the construction, presence, or maintenance of temporary or permanent structures. See Pilot Plant, Inc., 168 IBLA 201, 214-15 (2006). Claimants were required to notify the BLM by October 15, 1996, and were required to comply with the requirements of Subpart 3715 by August 18, 1997.

---

[1] Hall also purchased Silver Swan #2 mining claim, claim # CAMC 49333, and the White Swan #1-#10 mining claims, claim numbers 49334 through 49343. The White Swan mining claims were forfeited in 2001 for failure to pay the maintenance fees. None of these claims are the subject of this litigation.

30. Hall did not notify the BLM of her occupancy on the claims nor did she establish that the structures were incident to mining. For this failure, the BLM properly could have engaged in some form of enforcement action under 43 C.F.R. § 3715.7-1 including the issuance of a NONC requiring Hall to bring her occupancy into compliance with the Subpart 3715 regulations. However, the BLM failed to issue such NONC. Instead, the BLM sought Hall's permission to incorporate the structures into its Adopt-a-Cabin program which would open the structures to public use.

31. In February of 1999, and again in March of 1999, the BLM contacted Louise Hall and asked her to sign a MOU which would place the structures into the Adopt-a-Cabin program. Hall refused.

32. In September of 1999, the BLM again contacted Hall and asked her to quitclaim deed the house and other structures on the Silver Swan mining claim to the BLM so that the BLM could enter the structures into the Adopt-a-Cabin program.

33. On November 21, 2000, the BLM published amendments to its regulations at 43 C.F.R. Subpart 3809 which provided that the occupancy of structures on mining claims could only lawfully continue after January 21, 2001, if the owner of the mining claims filed a notice of intent or a plan of operations under 43 C.F.R. Subpart 3809.

34. In June of 2001, Hall forfeited ownership of some of her other mining claims, specifically the White Swan claims, for failure to pay the maintenance fees for the 2001 assessment year by September 1, 2000, as required under 30 U.S.C. § 28f(a).

35. However, the BLM mistakenly concluded that the structures on the Silver Swan mining claim were on the White Swan claims which had been forfeited. Thus, on November 3, 2001, the BLM entered into a MOU with certain volunteers, namely the Sierra Club, entering the structures on the Silver Swan mining claim into the Adopt-a-Cabin program.

36. This MOU was signed by Steve Smith, the Adopt-a-Cabin Program Manager from the BLM Ridgecrest Field Office in California. The MOU fails to state anything about the ownership of the structures although it does say that there is no mining claimant nor mining claim on the property.

37. Hall did not receive a copy of the Memorandum of Understanding at the time it was signed.

38. Once the MOU was signed and under the terms of the MOU, the BLM authorized the public's use of the structures for overnight camping, meetings or other activities related to casual use mining.

39. The MOU also allowed casual use mining on the unpatented mining claim itself.

40. Signs were also placed on the property which stated that the property was part of the Adopt-a-Cabin program. These signs contained the symbol or seal of the BLM.

41. In 2002, Louise Hall sold the structures located on the Silver Swan mining claim to Glenn Gould. As stated above, at the time of the sale, neither Glenn Gould nor Louise Hall were aware that the structures had been incorporated into the BLM's Adopt-a-Cabin program.

42. While a part of the BLM's Adopt-a-Cabin program, the BLM volunteers removed Hall's personally owned mining equipment used for mining gemstones for jewelry from the unpatented mining claim. This equipment consisted of:

A. Steel welded bat cages and locks from mining tunnels and mining shafts. These cages and locks were placed on the opening to the mine to stop private trespass on the property;

B. Mining shaft and tunnel shoring;

C. Equipment and supplies for full production jewelry and sculptures;

D. Mineral beads and findings;

E. 400 pounds of cut and polished gemstones, 200 pieces of finished gemstones and beaded jewelry, one ton of slabbed and blocked onyx, 20 marble tabletops, additional marble and soapstone sculptures;

F. One small trencher, one gasoline engine concrete mixer, 2,500 gallon water storage tank, 4-55 gallon barrels for water storage, batteries and generators, solar panels, three ore carts and tracks, stone setting and jewelry making equipment, saws used for quarrying stone, various sized core drills, other additional equipment related to mining, and mineral product finishing.

43. On July 29, 2002, the BLM admitted that Gould's structures on Hall's unpatented mining claim had been mistakenly entered into the Adopt-a-Cabin program and that it had erected the Adopt-a-Cabin signs in error. However, the BLM failed to remove all of signs from the unpatented mining claim designating the structures as part of the Adopt-a-Cabin program nor did the BLM make any

effort to dispel the notion that property was open to the public and was a public recreation site.

44. On March 4, 2004, Hall received a NONC regarding the structures on the mining claim. The BLM determined that the structures did not comply with the regulations under 43 C.F.R. Subpart 3715 because they were not being used for purposes reasonably incident to mining. The NONC provided for a thirty (30) day period to demonstrate that the structures were needed for mining operations or else they were to be removed by the owner. When neither Hall nor Gould responded, the BLM issued a CO on April 21, 2004, which mandated that Hall cease maintaining her claims on public land.

45. Hall informed the BLM that the structures on her unpatented mining claim had been sold, but that she had power of attorney to speak on behalf of the owner of the structures, Gould.

46. On March 31, 2004, Hall administratively appealed the NONC and CO to the Interior Board of Land Appeals ("IBLA"). The issue before the IBLA was whether the BLM's adoption of the structures into the Adopt-a-Cabin program relieved Hall or Gould of liability for the structures.

47. The IBLA held that the structures on the Silver Swan mining claim were not being used for any purpose reasonably incident to mining and were therefore subject to removal. See Mary Louise Hall, IBLA 2004-204, *16 (2004). However, the IBLA stated that the BLM was responsible for removing the structures from the property due to the BLM's non compliance with 43 C.F.R. Subpart 3715. Id. Thus, the IBLA ruled that it was not Hall's responsibility to deter the public from

her unpatented mining claim since the BLM had invited the public use of the property. Id.

48. The IBLA also noted that Hall had a legitimate question as to whether the BLM had done enough to dispel the public perception that her property was available for public use. Id. at *15. Additionally, it found that the BLM had failed to remove the Adopt-a-Cabin signs placed on the mining claim and that the BLM failed to post information advising the public that the site was not available for public use. Id.

49. Upon information and belief, to date, volunteers still frequent the mining claim, and even engage in mining activities on the claim. Upon information and belief, it appears that the volunteers have dug new mining tunnels on Hall's unpatented mining claim. Although the BLM eventually removed the Adopt-a-Cabin signs from the mining claim, it has taken no further action to dispel the notion that the structures and mining claim are open to the public for public use.

50. Hall has attempted to mine her claim. In her attempts, she has been subject to abuse by the volunteers when attempting to access her claim and has even been shot at. Additionally, Hall has been unable to find help for her mining operations due to the public perception that the Silver Swan mining claim is a public recreation claim. Hall's mining equipment has also been removed from the site.

51. As Hall's unpatented mining claim was located prior to 1955, she is entitled to exclusive possession over the surface of the property; and she has the authority to exclude the public from her property.

52. The estimated value of the taking of the unpatented mining claim and mining equipment is $280,000.00.

**II. Factual allegations as they pertain to Plaintiff Gould**

53. In 2002, Louise Hall sold the structures located on the Silver Swan mining claim to Glenn Gould, unaware that the structures had been incorporated into the Adopt-a-Cabin program.

54. After purchasing the structures from Hall, Gould gave Hall the power of attorney to speak on his behalf with regard to the structures on the unpatented mining claim.

55. While a part of the Adopt-a-Cabin program, the BLM volunteers entered into Gould's structures and gutted them to fit the mining period perception including removing the roof and all personal possessions that remained inside of the structures.

56. The BLM has admitted that it has not given the proper due process to mining claimants or owners of structures on such mining claims prior to "taking" the structures for public use. Upon information and belief, there have been over 32 structures in California incorporated into the Adopt-a-Cabin program. However, only two of the structures were quitclaim deeded to the BLM and that for the remainder "we [BLM] never really did anything to declare that the property was abandoned and/or no longer needed for the mining claim."

57. On July 29, 2002, the BLM admitted that Gould's structures on Hall's unpatented mining claim had been mistakenly entered into the Adopt-a-Cabin program and that the BLM had erected the Adopt-a-Cabin signs in error.

However, the BLM failed to remove all of signs from the unpatented mining claim designating the structures as part of the Adopt-a-Cabin program nor did it make any effort to dispel the notion that the structures and claim were open to public use. Upon information and belief, volunteers with the Adopt-a-Cabin program continue to conduct annual meetings and hold gatherings in the structures.

58. On March 4, 2004, the BLM issued a NONC regarding the structures on the mining claim. The BLM determined that the structures did not comply with the regulations at 43 C.F.R. Subpart 3715 because they were not being used for purposes reasonably incident to mining. The NONC provided for a thirty (30) day period to demonstrate that the structures were needed for mining operations or else they were to be removed by the owner. When neither Hall nor Gould responded, on April 21, 2004, the BLM issued a CO which mandated that Hall cease maintaining her claims on public land.

59. On March 31, 2004, Hall administratively appealed the NONC and CO to the Interior Board of Land Appeals ("IBLA"). The issue before the IBLA was whether the BLM's adoption of the structures into the Adopt-a-Cabin program relieved Hall or Gould of liability for the structures.

60. The IBLA held that the structures on the Silver Swan mining claim were not being used for any purpose reasonably incident to mining and were therefore subject to removal. See Mary Louise Hall, IBLA 2004-204, *16 (2004). However, the IBLA stated that the BLM was responsible for removing the structures from the property due to the BLM's non-compliance with 43 C.F.R. Subpart 3715. Id. Thus, the IBLA ruled that it was not Hall's or Gould's responsibility to deter the

public from the Silver Swan structures and unpatented mining claim since the BLM had invited such public use. Id.

61. The IBLA also noted that Hall had a legitimate question as to whether the BLM had done enough to dispel the public perception that the structures were available for public use. Id. at *15. Additionally, it found that the BLM had failed to remove the Adopt-a-Cabin signs placed on the unpatented mining claim and that the BLM failed to post information advising the public that the structures and claim were not available for public use. Id.

62. The estimated value of the taking of Gould's structures on Hall's unpatented mining claim is approximately $907,310.00.

**CLAIM FOR RELIEF**

**Claim One: Violation of the Fifth Amendment of the United States Constitution's Prohibition of the Taking of Private Property Without Just Compensation**

63. The Plaintiffs reassert and reallege the allegations in the Paragraphs above as if fully stated herein.

64. The Fifth Amendment of the United States Constitution provides, in part: "nor shall private property be taken for public use, without just compensation."

65. The Plaintiffs' ownership of the mining equipment, structures and the mining claim constitutes a valid property interest for purposes of compensation under the Fifth Amendment. Even if the actions of the government were not authorized or were not proper, the Plaintiffs are entitled to just compensation. Osprey Pacific Corp. v. United States, 41 Fed. Cl. 150, 157 (Fed. Cl. 1998).

66. The Mining Law of 1872 provides that locators of mining claims "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations." See 30 U.S.C. § 26 (2000); see also, Silbrico Corp. v. Ortiz, 878 F.2d 333, 335 (10th Cir. 1989) (claimant has the exclusive right to use the surface as against all parties except the United States). This right is limited to uses "reasonably necessary in the legitimate operation of mining." Teller v. United States, 113 F. 273, 280 (8th Cir. 1901).

67. In 1955, Congress enacted the Multiple Use Mining Act, also known as the Surface Resources Act ("Act"), which provides that mining claims located under the mining laws of the United States "shall not be used, prior to issuance of a patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto." See 30 U.S.C. § 612(a). Section 4(a) of the Act described the law as it existed prior to 1955. Section 4(b) applied only to claims located after 1955. Id., see also, Mary Louise Hall, IBLA 2004-204 (2004). Thus, under the Act, because Hall's claim was located prior to 1955, she "gained the exclusive right of possession and enjoyment of the surface of the claim." Nevada Pacific Mining Co., 164 IBLA 384, 384 (2005); see also, Talache Mines v. U.S., 218 F.2d 491, 500 (9th Cir. 1955); U.S. v. Langley, 587 F. Supp. 1258, 1263 (D.C. Cal. 1984) (claimants whose claims were located prior to 1955 have the right to exclude the public from the claim).

68. Prior to 1996, the BLM required a claimant to file a notice of intent to mine for operations which were more than "casual use." See 43 C.F.R. 3809.1-3. "Casual

use" means activities which result in no or negligible disturbance to the public lands or resources. See 43 C.F.R. § 3809.5.

69. In 1996, the BLM issued regulations at 43 C.F.R. Subpart 3715 which required claimants to notify the BLM of occupancies on mining claims and established that any occupancy of the mining claim is considered reasonably incident to mining. Regardless of whether the mining operations required a mining plan or notice of intent to mine, or involved only casual use, claimants were required to file information to justify the occupancy. See 43 C.F.R. §§ 3715.3, 3715.3-2. When claimants are not in compliance with Subpart 3715, the BLM may issue a NONC requiring corrective action in compliance with Subpart 3715, a CO requiring all use and occupancy of the premises to cease until there is compliance with Subpart 3715, or it may order an immediate suspension of all use and occupancy of the claim until such time as compliance with Subpart 3715 is achieved. See 43 C.F.R. § 3715.7-1.

70. Under 43 C.F.R. § 3715.5-2, property which is left behind on public lands becomes the property of the United States after ninety (90) days providing compliance with applicable laws. See 43 C.F.R. § 3715.5-2; see also, BLM Manual H-9232-1. The BLM Manual requires the BLM to post notice when valuable personal property is left on public lands. See BLM Manual H-9232-1.

71. Although Hall owns an unpatented mining claim in which the government holds the title in the fee simple estate, unpatented mining claims are property protected by the Fifth Amendment against uncompensated takings. Best v. Humboldt

Placer Mining Co., 371 U.S. 334, 335-336 (1963); see also, Kunkes v. U.S., 78 F.3d 1549, 1551 (Fed. Cir. 1996).

72. To have a valid property interest in an unpatented mining claim, the first step is to determine the validity of the claim. To be valid, there must have been a discovery of minerals within the claim and such discovery must be of the kind that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." Best, 371 at 335, citing, Castle v. Womble, 19 L.D. 455, 457 (1984); see also, United States v. Coleman, 390 U.S. 599 (1968). Hall's claim has been determined by the Department of the Interior to be a valid mining claim and valuable minerals have been discovered within the claim.

73. Plaintiff Gould, as owner of the structures on the property has a valid property interest in those structures. Both case law and the federal regulations support the proposition that structures on unpatented mining claims are personal property. The IBLA stated "that where a party lawfully acquires title to structures and/or personal property placed on a mining or mill site claim through a chain of title, by virtue of contract, agreement, or the operation of law, and exercises dominion and control over it, the pronouns in the regulations at 43 C.F.R. §§ 3715.5-1 and 3715.5-2 (the regulations governing the requirement to remove) are properly read to apply to such subsequent successors in interest to the property." Marietta Corporation Comstock Ore Buyers, 164 IBLA 360, 376 (2005). Title 43 C.F.R. §§ 3715.5-1 and 3715.5-2, provide that property left on public lands after ninety (90) days after occupancy ends becomes the property of

the United States. However, until a NONC, CO or order for immediate suspension are issued, the structures on the unpatented mining claim are private property which belong to Plaintiff Gould.

74. The BLM's action of authorizing the public to enter into and use the structures, resulting in total destruction of the structures such that the BLM is going to destroy them, is a permanent taking of private property without due process and just compensation in violation of the Fifth Amendment of the U.S. Constitution.

75. The value of the structures greatly exceed the statutory requirements, thus this Court has jurisdiction over this case.

76. The BLM's action of authorizing the public to enter into and use the unpatented mining claim resulting in a theft of the mining equipment described herein and a taking of some of the mineral itself is a taking of private property without due process and just compensation in violation of the Fifth Amendment of the U.S. Constitution.

77. The value of the mineral and equipment taken from the Silver Swan unpatented mining claim greatly exceed the statutory requirements, thus this Court has jurisdiction over this case.

## REQUESTS FOR RELIEF

WHEREFORE, the Plaintiffs request that the Court:

A. Enter a declaratory judgment against the United States finding that the Defendants took the Plaintiffs' private property in violation of the Fifth Amendment of the U.S. Constitution;

B. Award the Plaintiffs damages which include the reasonable value of the mining equipment, the structures, and mining claim, including the minerals taken, in the amount of $1,187,310.00 to be specifically proven at trial;

C. Award the Plaintiffs the fees and costs of litigation; and

D. Grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 2nd day of November, 2007.

Karen Budd-Falen
BUDD-FALEN LAW OFFICES, L.L.C
300 East 18th Street
P.O. Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile