# United States Department of the Interior

CERTIFIED

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy St. Suite 300
Arlington, VA 22203

703 235 3750 703 235 8349 (fax)

FAX

March 15, 2007

| | | |
|---|---|---|
| IBLA 2004-204 | : | CACA-45693 |
| | : | |
| MARY LOUISE HALL | : | Mining Claim Occupancy |
| | : | |
| | : | Affirmed in Part; Reversed in Part |

## ORDER

Mary Louise Hall has appealed from a January 21, 2004, decision and notice of noncompliance (NON) issued by the Ridgecrest, California, Field Office, Bureau of Land Management (BLM), determining that a stone cabin and other structures on the Silver Swan unpatented lode claim (CAMC 49332) were not being used for any purpose reasonably incident to mining as required by 43 CFR 3715.2 and that maintaining those structures requires a properly submitted notice or an approved plan of operations under 43 CFR 3809.11(a). The decision explained that Hall could bring herself and her property into compliance with applicable regulations by either (1) removing the cabin and other property from the claim within 30 days or (2) demonstrating that the cabin is genuinely needed for mining operations. The decision stated that if Hall did neither within 30 days, BLM would issue a cessation order (CO). 1/

---

1/ Hall's notice of appeal did not include a petition for a stay, so BLM's decision went into effect the day after the notice of appeal was due. See 43 CFR 4.21(a). Because Hall did not receive the NON until Mar. 5, 2004, the notice of appeal was not due until Apr. 5, the day after Apr. 4 which fell on a Sunday. Because the NON did not go into effect until April 6, the 30-day compliance period did not end until May 6. Mistakenly believing that the 30-day compliance period had expired, on Apr. 28, 2004, BLM issued a CO directing Hall to "cease maintaining your personal property on the public lands." The CO required her to begin removal of the cabin and other structures from the site within 30 days after receipt of the letter and to complete removal within 90 days after receipt. The CO stated: "Anything left on the public lands at this site after 90 days will become property of the U.S. Government by operation of 43 CFR 3715.5-1 and 3715.5-2 (attached). If the BLM so chooses, you will be liable for the costs BLM incurs in removing and disposing of this property after that date." The CO was sent by certified mail to Hall's address of record, a post office box in Tucson, Arizona. A tracking record from the United States Postal Service

(continued...)

We affirm BLM's finding that the cabin and other structures on the Silver Swan claim were not being used for any purpose reasonably incident to mining as required by 43 CFR 3715.2. At no point during Hall's ownership of mining claims has she provided any justification for keeping these structures on her claims. Moreover, throughout this appeal, Hall has disclaimed any intention to use these structures for activities reasonably incident to mining operations, making them subject to removal because their presence is unlawful. Nevertheless, for reasons explained below, we conclude that BLM may not properly hold Hall responsible for removal of the structures, and reverse BLM's decision to the extent that it requires her to remove them.

LEGAL AND FACTUAL BACKGROUND

History of the Mining Claims. The Silver Swan claim was located in 1930 and is one of a number of claims Hall purchased in 1993. It abuts the Silver Swan #2 claim (CAMC 49333) that was located in 1953. A mineral survey of both claims was approved in 1973. (M.S. 6814.) [2/] Hall also purchased in 1993 the White Swan #1 through #10 mining claims (CAMC 49334 - 49343) which were immediately to the north of the Silver Swans claims. The White Swan claims were located in 1958. All twelve claims are at the southernmost end of the Inyo Mountains in Inyo County, California, in an area known as the Talc City Hills and have been collectively known as the White Swan mine. (BLM Surface Use Determination, Jan. 15, 2004.) Reports filed by Hall with Inyo County state that a house (cabin) and garage were built on the Silver Swan claim in 1930 and three sheds and two other structures were built on it in 1957.

The circumstances leading to this appeal arise from Hall's failure to comply with regulatory requirements that govern occupancy of mining claims and from BLM's failure to attempt to enforce those requirements until many years after it

---

1/ (...continued)
shows that notice of the CO was left at the post office on May 1, remained unclaimed on May 17, and was returned to BLM on May 25, which is deemed to be the date of effective constructive notice to Hall under 43 CFR 1810.2(b). See Michele M. Dawursk, 71 IBLA 343, 344-48 (1983). No notice of appeal from the CO was filed.

2/ The mineral survey shows the Silver Swan claims as situated in unsurveyed secs. 22, 23, and 26, T. 18 S., R. 39 E., Mt. Diablo Meridian. The field notes for the survey identify improvements such as the discovery shafts and tunnel that satisfy the requirement for the expenditure of $500 per claim as required by 30 U.S.C. § 29 (2000). They also list the cabin, garage, and three out-buildings as the then-claimant's. (M.S. 6814 Field Notes, pp. 6-7.) Neither BLM nor Hall disputes the fact that these structures were included in the "real property" conveyed to Hall by a 1993 quitclaim deed. See Marietta Corporation, 164 IBLA 360, 374-77 (2005).

learned of Hall's unlawful occupancy. We first set forth the applicable legal requirements.

The Mining Law. The Mining Law of 1872 provides that locators of mining claims "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations." 30 U.S.C. § 26 (2000). Although some mining claimants may have once believed that they had an unrestricted right to make use of the surface of a mining claim in whatever manner and for whatever purpose chosen, courts made it clear that the right to use the surface and surface resources was limited to uses "reasonably necessary in the legitimate operation of mining," Teller v. United States, 113 F. 273, 280 (8th Cir. 1901), or "incident to mining operations." United States v. Rizzinelli, 182 F. 675, 684 (D. Idaho 1910). Courts have recognized that occupancy of a mining claim for purposes not related to mining operations constitutes a trespass for which the government can collect damages. E.g., United States v. Nogueira, 403 F.2d 816, 825 (9th Cir. 1968).

Surface Resources Act. Congress later recognized that "[s]ome locators in reality, desire their mining claims for commercial enterprises such as filling stations, curio shops, cafes, or for residence or summer camp purposes." (H. Rep. No. 730, 84th Cong., 1st Sess., reprinted in 1955 U.S. Code Cong. & Ad. News at 2479.) Congress enacted the Surface Resources Act of July 23, 1955, subsection 4(a) of which provides that mining claims located under the mining laws of the United States "shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a) (2000). Although the statute made the quoted provision applicable to claims located after July 23, 1955, we have stated that this provision was "simply declaratory of the law as it existed prior to 1955," citing the Teller and Rizzinelli cases. Bruce W. Crawford, 86 IBLA 350, 364, 92 I.D. 208, 216 (1985) (emphasis in original, footnote omitted). 3/

---

3/ Although subsection 4(a) may have been declaratory of the law as it existed prior to 1955, subsection 4(b) was new. Subsection 4(b) of the Surface Resources Act, 30 U.S.C. § 612(b) (2000), provides that a claim located after July 23, 1955, would "be subject, prior to issuance of patent therefor, to the right of the United States to manage * * * surface resources thereof * * *," and "the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes * * *." See, e.g., United States v. Curtis-Nevada Mines, Inc., 611 F.2d 1277, 1280 (9th Cir. 1980); Bruce W. Crawford, 86 IBLA at 363-64, 92 I.D. 215-16. Claims such as the Silver Swan that were located before July 23, 1955, could become subject to the provisions of section 4(b) after a proceeding under sections 5 or 6, 30 U.S.C. §§ 613, 614 (2000). United States v. Mineral Ventures, Ltd., 14 IBLA 82, 80 I.D. 792 (1973). In Nevada-Pacific Mining Co., 164 IBLA 384,
(continued...)

Federal Land Policy and Management Act of 1976 and Subpart 3809 Regulations. In 1976, Congress enacted the Federal Land Policy and Management Act (FLPMA) with provisions that imposed upon the Secretary of the Interior a responsibility to prevent unnecessary or undue degradation of the public lands, by regulation or otherwise. See 43 U.S.C. §§ 1732(b), 1740 (2000). To implement this directive with respect to mining claims, BLM issued regulations in 1980, 45 FR 78902, 78909 (Nov. 26, 1980), that required an operator to file a notice of intent to mine at least 15 days in advance of mining activity for mining operations that cause less than 5 acres of disturbance during the calendar year, but amount to more than casual use of the surface. 43 CFR 3809.1-3 (2000). For larger operations, the regulations required mining plans of operations. 43 CFR 3809.1 (2000). The 1980 regulations, however, did not require a claimant to obtain BLM approval of any new or existing occupancy. See Bruce W. Crawford, 86 IBLA at 388-89, 92 I.D. at 229. In Crawford, the Board required BLM to initiate a contest proceeding to establish that the claimants' occupancy was not reasonably incident to mining. 86 IBLA at 401-402, 92 I.D. at 236-37; see also, United States v. Doherty, 125 IBLA 296 (1993).

Subpart 3715 Regulations. Because claimants were not required to obtain prior BLM approval for their occupancies, many claimants continued unlawful occupancies not reasonably incident to mining. They were generally left unchallenged. [4/] In 1996, BLM issued regulations at 43 CFR Subpart 3715 that required claimants to notify BLM of occupancies and establish that any occupancy was reasonably incident to mining. 61 FR 37115, 37116 (July 16, 1996). These regulations define "occupancy" broadly to mean "full or part-time residence on the public lands," as well as

> activities that involve residence: the construction, presence or maintenance of temporary or permanent structures that may be used for such purposes; or the use of a watchman or caretaker for the

---

[3/] (...continued)
391-92 (2005), we held that BLM did not have the authority to issue a right-of-way across any portion of the public land which is subject to a valid unpatented mining claim located before July 23, 1955, without the express permission of the claimant. In that case as here, there is no evidence that the claim was made subject to the procedures provided in sections 5 or 6 of the Surface Resources Act. 164 IBLA at 391 n.6.

[4/] In August 1990, the General Accounting Office (GAO) issued a report with such findings. (Unauthorized Activities on Hardrock Claims, GAO/RCED-90-111, cited at 61 FR 37116, 37117 (July 16, 1996).) The report recommended that BLM revise its regulations to establish that residency and nonmining commercial activities are normally not authorized, thereby shifting the burden of proof to the claim holder to show that an activity is incidental to mining.

> purpose of monitoring activities. Residence or structures include, but are not limited to, barriers to access, fences, tents, motor homes, trailers, cabins, houses, buildings, and storage of equipment or supplies.

43 CFR 3715.0-5. We have recognized that occupancy encompasses the construction, presence, or maintenance of temporary or permanent structures, even if they are not actually used as a residence. See, e.g., Pilot Plant, Inc., 168 IBLA 201, 214-15 (2006), and cases cited.

Regardless of whether operations required a mining plan or notice of intent, or involved only casual use, claimants were required to file information to justify the occupancy. 43 CFR 3715.3, 3715.3-2. Claimants who had existing occupancies were required to notify BLM by October 15, 1996, and comply with the requirements of Subpart 3715 by August 18, 1997. See 43 CFR 3715.4. If Hall wanted to keep her structures on her claims, her activities on the claims had to satisfy five requirements listed in 43 CFR 3715.2. Those activities had to be reasonably incident [5/]; (b) constitute substantially regular work [6/]; (c) be reasonably calculated to lead to the extraction and beneficiation of minerals; (d) involve observable on-the-ground activity that BLM may verify under 43 CFR 3715.7; and (e) use appropriate equipment that is presently operable.

Thus, when Hall acquired the Silver Swan claim in 1993, the presence of the cabin and other structures could be justified only if they were reasonably incident to mining, but unless she was conducting operations that were more than "casual use," she was not required to notify BLM. After issuance of the 3715 regulations, Hall was

---

5/ 43 CFR 3715.0-5 defines "reasonably incident" to mean "the statutory standard 'prospecting, mining, or processing operations and uses reasonably incident thereto' (30 U.S.C. 612). It is a shortened version of the statutory standard. It includes those actions or expenditures of labor and resources by a person of ordinary prudence to prospect, explore, define, develop, mine, or beneficiate a valuable mineral deposit, using methods, structures, and equipment appropriate to the geological terrain, mineral deposit, and stage of development and reasonably related activities."

6/ 43 CFR 3715.0-5 defines "substantially regular work" to mean "work on, or that substantially and directly benefits, a mineral property, including nearby properties under your control. The work must be associated with the search for and development of mineral deposits or the processing of ores. It includes active and continuing exploration, mining, and beneficiation or processing of ores. It may also include assembly or maintenance of equipment, work on physical improvements, and procurement of supplies, incidental to activities meeting the conditions of §§ 3715.2 and 3715.2-1. It may also include off-site trips associated with these activities. The term also includes a seasonal, but recurring, work program."

required to notify BLM of the existence of her occupancy by October 15, 1996, and provide information to justify her occupancy. 43 CFR 3715.4.

FACTUAL EVENTS LEADING TO THE APPEAL

Hall Fails to Justify the Occupancy. There is no evidence in the record that Hall notified BLM as required by 43 CFR 3715.4, and she therefore became subject to enforcement actions. 43 CFR 3715.4-2. Enforcement actions include issuing a NON requiring Hall to take corrective action within 30 days and a CO if corrective action was not timely taken. 43 CFR 3715.7-1. Combined Metals Reduction Co., 170 IBLA 56, 77 n.13 (2006); Leadville Corp., 166 IBLA 249, 254-55 (2005); Bradshaw Industries, 152 IBLA 57, 62 (2000).

The record makes it clear that Hall could not justify the presence of the cabin and other structures under 43 CFR 3715.2. On April 4, 1997, she filed a report with the Inyo County Assessor stating that there had been no production from the claims in 1996. The report form contained a space to indicate the estimated date for beginning mining operations. Hall left this space blank and stated: "[A]t this time I am not doing any mining work on these claims."

A BLM inspection report dated August 16, 1997, indicated that the mining claim was inactive. The inspection report also stated that the "main living structure has been heavily vandalized and many appliances and furniture have been stolen." [7/] Hall filed a report with the Inyo County Assessor on March 20, 1998, which showed no production and stated: "No date set at this time" for beginning mining operations and "[b]uilding properties destroyed by vandals." In 1999, Hall filed a report showing no production and stating that the structures "remain the same * * *." Thus, it is clear from the record that at this juncture, because Hall had neither notified BLM by October 15, 1996, of her occupancy nor brought her occupancy into compliance by August 15, 1997, BLM properly could have issued a NON requiring Hall to bring her occupancy into compliance with the Subpart 3715 regulations. See Robert B. Wineland, 169 IBLA 212 (2006) (affirming BLM decision requiring mining claimant to remove at his own expense structures from mining claim because occupancy not reasonably incident to prospecting, mining, or processing operations).

BLM Considers Whether to "Adopt" the Cabin. BLM took no enforcement action against Hall at that time. Instead, BLM sought Hall's permission to incorporate the cabin into an "Adopt-a-Cabin" program so that volunteer members of the public-at-large could repair damage caused by vandals and open the cabin to use by others when Hall was not using it for mining operations. This program was developed over

[7/] Although the report refers to the White Swan #1 claim, it is on the Silver Swan claim that this structure is located.

the years by the recreation staff at BLM's Ridgecrest Field Office to make abandoned and dilapidated cabins on the public lands available for public use. [8/] Under "Adopt-a-Cabin," volunteers would restore and preserve these cabins and make them available for hikers and other recreational users. An article in the December 17, 1998, Inyo Register referred to the vandalized cabin at the "White Swan Mine" as a potential site for a group of amateur astronomers who believed that the remoteness of the southern Inyo area provided some of the clearest skies in the United States. Notes in the record from early 1999 show that others were interested in preserving the cabin. Thus, even though Hall was unwilling to justify the presence of the structures on her claim or even to repair or maintain them, BLM had volunteers who were willing to repair and maintain the cabin if Hall would give them permission.

In letters to Hall dated February 22 and March 4, 1999, BLM discussed the extensive vandalism to the stone cabin and explained BLM's "Adopt-a-Cabin" program, as well as the interest in it expressed by the amateur astronomers. The letters proposed that Hall voluntarily sign a Memorandum of Understanding (MOU) with the BLM, under which she could share use of the cabin with the public on a "first come, first serve" basis. BLM explained that the MOU would authorize the continued existence of the cabin. [9/]

In a letter to Hall dated April 13, 1999, BLM stated that use and occupancy of buildings falls under regulations at 43 CFR Subpart 3715 and that old structures are not in compliance where "there is no substantial mining to support the need for buildings and other structures on the mining claims." The letter again described the interest in the cabin expressed by the astronomy group, stating that some houses "on mining claims which did not meet the use and occupancy standards of 43 CFR 3715 were allowed to remain because they were taken into the Adopt-a-Cabin program." BLM also asserted that an MOU could permit a mining claimant who resumes mining to exclusively occupy the house during periods of active and substantial mining operations.

On September 6, 2000, BLM issued a letter responding to a phone call from Hall concerning the structures on her claim. The letter referred to the vandalism and noted that "the elements are starting to degrade the interior." The letter stated that neither BLM nor its volunteer groups could help preserve the buildings at the site because it was Hall's private property. Instead of seeking an MOU, BLM now asked Hall to consider "quitclaiming the house and other structures to the BLM." After that,

---

[8/] Under BLM regulations, property left behind on the public lands becomes property of the United States. E.g., 43 CFR 3715.5-2.

[9/] While we recognize the common sense underpinnings of BLM's representations to Hall, we express no opinion on the legality of this method to remedy unlawful occupancy of a mining claim under the Subpart 3715 regulations.

the house would be cleaned and secured and entered into the Adopt-a-Cabin program. BLM then explained that quitclaiming the house and other structures to BLM would not affect the underlying mining claims:

> If you or your mining lessee or operator were to resume active mining on the mining claims, it would still be possible to occupy the house during the duration of mining. This occupation could happen even after the house was quitclaimed to BLM. After mining, use and occupancy of the house would return to the stewardship of the Adopt-a-Cabin program.

In response to concerns expressed by Hall, the letter denied that Hall's buildings were on a "burn" list or that there was a plan to burn structures in the desert. BLM included a quitclaim deed for Hall to sign.

Hall responded as follows in a letter dated September 18 that explains her intentions regarding the claims:

> Concerning Silver Swan CAMC 49332 I intend to demolish and clean-up this site. I have paid property taxes on this site for years. I feel it is a danger to the public & that I would be financially liable if someone would be hurt there. This is the main claim that has the highest & most valuable minerals. When I resume mining operations, it will be the main site that I will be mining. I may quitclaim the deed to the White Swan claim that I feel is of a historical nature back to BLM (or possibly all of the claims) as soon as they are willing to reimburse my BLM fees back to when I first purchased the 12 claims. I also should be compensated financially for my homestead rights. I intend to patent these claims as soon as the moratorium on patenting is lifted if I need to. I had planned to restore this site [but] this seems impossible now, due to vandalism, earthquakes, and the elements, which have degraded this site beyond repair. In the meantime, I have discovered more valuable minerals there than I had originally thought. I feel that it is only right & fair that I be financially compensated for my mineral values also. I plan to restore back to nature the area that I do not mine according to BLM guidelines. I am open to negotiations or should I proceed with my plans as stated? I would prefer to remain the owner, but I would like your advi[c]e and the heavy equipment operator I have hired needs for me to be told by your office what I can or can not let him do on this property to protect him legally. Thank you.

In a letter dated September 20, BLM again referred to the Adopt-a-Cabin program and the astronomy club's interest in using the building. After noting that

the claims were hers to enjoy, BLM advised Hall of the need for an approved mining plan under 43 CFR Subparts 3715 and 3809. Hall never submitted a notice of intent to mine or a mining plan of operations.

BLM Amends Subpart 3809. On November 21, 2000, BLM published amendments to the Subpart 3809 regulations that became effective January 20, 2001. 65 FR 69998 (Nov. 21, 2000). The definition of "casual use" was amended to explain that it "does not include 'occupancy' as defined in §3715.0-5 of this title * * *." 43 CFR 3809.5. This meant that occupancy could lawfully continue after January 21, 2001, only if Hall filed a notice of intent or a plan of operations under 3809. The amended regulations also required the notice or plan to be accompanied by a bond or "financial guarantee" sufficient to cover the costs of reclamation. We have held that under these new regulations, BLM has no authority to waive the requirement that a claimant submit an individual financial guarantee, i.e., a bond. [10/] Robert B. Wineland, 169 IBLA at 219-20; Nevada Mineral Processing, 157 IBLA 223, 228 (2002). Hall had not been operating under a notice of intent and, since her occupancy could no longer be defined as "casual use," a notice of intent (or mining plan of operations) and a bond were required.

Thus, as of January 20, 2001, Hall had never provided legal justification for keeping the cabin or other structures on her claim and was in violation of the Subpart 3809 regulations. She never submitted any notice of intent or mining plan, nor did she submit a bond sufficient to cover the costs of reclamation. Her September 18, 2000, letter makes clear that she had no immediate plans to undertake any mining operations that would justify the presence of structures on her claim. Rather than use the structures, she explicitly states her intention to "demolish" them and her opinion that restoration "seems impossible."

BLM and Volunteers Adopt Hall's Cabin. On June 14, 2001, BLM issued a decision declaring the two Silver Swan and the ten White Swan claims forfeited by operation of law for failure to file the maintenance fees for the 2001 assessment year by September 1, 2000, as required by 30 U.S.C. § 28f(a) (2000). After Hall

---

[10/] The amended regulations provided that an operator who had filed a notice before Jan. 20, 2001, may conduct operations for 2 years under the existing notice under the regulations previously in effect. 43 CFR 3809.300(a). Under 43 CFR 3809.503(a), an operator whose notice was on file with BLM on Jan. 20, 2001, was not required to file a financial guarantee or bond unless he modified or extended the notice under 43 CFR 3809.333. After 2 years, however, the operator may extend the notice under 43 CFR 3809.333, and meet the financial guarantee requirements of § 3809.503." 43 CFR 3809.333 (emphasis added). See 43 CFR 3809.552 (financial guarantee "must cover the estimated cost as if BLM were to contract with a third party to reclaim your operations").

submitted evidence that she had paid the maintenance fees for the Silver Swan claims, BLM issued a decision dated July 2, 2001, vacating its earlier decision with respect to the Silver Swan claims, but the 10 White Swan claims were forfeited. See 30 U.S.C. § 28i (2000).

It appears that BLM mistakenly concluded that what it called the White Swan cabin was on one of the forfeited White Swan claims rather than on the Silver Swan claim for which the fees were paid. On November 3, 2001, BLM signed an MOU setting forth an "Adopt-a-Cabin Agreement" with a representative of "Friends of the White Swan Cabin" to provide for the maintenance and general public use of the cabin. (2001 Group Volunteer Services Agreement and MOU.) Hall was not a party to this agreement. A sign bearing the words "WHITE SWAN ADOPT-A-CABIN" and featuring BLM's triangular seal was placed near the cabin. Groups of volunteers allegedly cleared debris from the cabin, attempted some repairs, and met there for recreational purposes.

As is evident from a series of e-mails between BLM staff in June and July 2002, Hall had learned of BLM's conversion of her cabin to public use by June of 2002 and called various BLM offices to voice her concerns. If she had been previously concerned that BLM was trying to take over her claims, her mistrust of BLM was only exacerbated by BLM's dedication of her cabin to public recreational use without her consent. Hall also expressed concern about her liability to users of the cabin and sought a release of liability by BLM. She even asked about burning the cabin as a means of relieving her of the liability she believed that it posed.

BLM Addresses the Mistaken Adoption. In a letter dated July 29, 2002, the BLM Ridgecrest Field Manager wrote that "volunteers associated with" BLM erected the sign "in error." But BLM did not acknowledge its own approval of an MOU between BLM and the volunteers. Apologizing for the "unfortunate mistake," BLM stated: "The sign will be removed. To the best of our knowledge, that cabin is your personal property." The letter acknowledged BLM's prior interest in accepting ownership of the structures for its Adopt-a-Cabin program, but stated that it was up to Hall to decide whether to keep the structures or dispose of them.

> No action will be taken regarding these structures at the present time. That is, no Notice will be required so long as you are only engaged in 'Casual Use' operations. [11/] However, it is also appropriate to remind you that any person is responsible for taking care of his/her personal

11/ We assume that this refers to a notice of operations required by 43 CFR Subpart 3809. Under the 2001 amendments to Subpart 3809, any occupancy must be covered by a notice of intent or plan of operations and a bond, which BLM could not waive.

> property on the public lands. The BLM will not place a guard on this cabin, nor can the BLM issue a waiver of liability for accidents occurring within the structures.
>
> Also, the BLM cannot and will not attempt to prevent camping, hiking or sightseeing in this area. Although the cabin here may be private property, the land around it is not. Please see 43 CFR 8365, attached. [12/] * * *

Hall Attempts to Extricate Herself from the Cabin. This letter did nothing to allay Hall's mistrust of BLM, and an active correspondence continued between Hall and BLM for well over a year until BLM issued the NON from which this appeal is taken. On July 3, 2003, she telefaxed three separate letters to BLM. In her letter to the Ridgecrest Field Manager, she complains that she "can no longer do business in the area, or hire any help, since you have told the local population that you now own my place." (July 3, 2003, letter to Ridgecrest Field Manager at 3.) Alleging criminal activity in the taking of her place, she asks whether BLM will pay her for the personal property that has been taken or return everything, and whether BLM will pay her rent, purchase her claims, or "continue to illegally assert your ownership of the house?" Id. Notwithstanding Hall's assertions about the illegality of BLM's ownership of the house, she makes it clear that she does not want it restored to her. She characterizes it as a "public nuisance" in which the hanta virus may be present as a result of "dead mice" there. Id. at 4. Hall raises similar concerns in separate letters telefaxed to BLM's State Director and Deputy Acting State Director on July 3.

In a letter dated September 15, 2003, Hall expressed a wish to submit a notice or plan of operations and her "need to know exactly what rights I have on my claims since you removed them for your illegal use of your adopt-a-cabin program." BLM responded by letter dated October 27, 2003, briefly stating the history of laws relating to surface use of mining claims, noting that the Silver Swan claim had been in noncompliance for 12 years before Hall's purchase in 1993. The letter advised Hall that there was no authority for her structures to occupy the public lands unless they are encompassed within a notice of intent or plan of operations under 43 CFR Subpart 3809 (or a lease per 43 CFR 2920 which BLM explained pertains to commercial operations not associated with mining claims). The letter requested a response in 30 days.

Hall had not received this letter when she wrote BLM on November 4 that it was now too late for her to work her claims. After receiving BLM's letter, she

---

12/ Rules at 43 CFR Subpart 8365 (2002) pertained to standards of conduct on public lands.

construed it as evidence that BLM has "no interest to ever return her house and claims" in a letter received by BLM on November 14.

On December 1, 2003, Hall telefaxed another letter to BLM, asking BLM for the reason BLM "used to take my place" and "to provide proof of the due process you used * * *." Reasserting that BLM has taken her house and claims, Hall stated that due to the October 27 letter, she "will no longer ask you to return them. * * * I have already refused to take the structures back because you have wrecked them beyond restoration." She further states: "I have also refused to take back the claims until you made it legal for me to do so and gave me a liability release for all the time you have had other people use my buildings and claims."

In a letter dated December 3, 2003, BLM responded to Hall's concerns about due process by asserting that "that process is underway as described in our letter dated Oct. 27, 2003," which "initiated" a process by which Hall could submit the required plan or notice of operations, but Hall never filed a reply. On December 23, Hall telefaxed BLM another letter stating that she did not own the structures on the claims and did not need to submit a plan stating she does.

In a letter dated December 26, 2003, Hall put forward another line of argument. Noting that she had previously asserted that she had the right to charge BLM rent for the illegal use of her structures but that she would have been willing to "forgive this debt" if BLM would return her property so she could work her claims, she now asserts that BLM had refused to "relinquish possession of" her place and believes that BLM has left her "as the party at risk for a premise liability lawsuit" and continues to prevent her from working her claims. BLM responded in a letter dated January 16, 2004, that the Silver Swan claims are recorded in her name and that she is the owner of the structures on those claims, but "as with structures on all mining claims, this recognition only extends to occupancy which is reasonably incident to on-going mining." In a handwritten 20-page letter to BLM dated January 19, 2004, Hall again recounts her history of the controversy surrounding the use of the cabin in the Adopt-a-Cabin program, asserting that BLM became the new owner "unless we agree to another resolution of our conflicts." (Jan. 19, 2004, letter at 2.)

<u>BLM Issues the NON</u>. On January 21, BLM issued the NON from which this appeal is taken. In responding to Hall's statements that BLM owns the cabin and has nullified the Silver Swan claims, BLM notes that Hall has continued to pay county property taxes for the cabin and claims and that she has paid the annual maintenance fees, showing Hall's awareness that the claims are still hers.

Unaware of the NON, Hall telefaxed to BLM's California State Director an 11-page handwritten letter dated January 25 responding to BLM's January 16 letter. Referring to BLM's requirement that structures on mining claims be reasonably incident to mining, Hall questions the legality of the Adopt-a-Cabin program where

there is no ongoing mining. (January 25, 2004, letter at 2.) Throughout this letter, she restates concerns expressed previously, being "stuck with a house[,] buildings and claims I can not use but you and the rest of the world can use"; she complains that the "claims and structures * * * are now known as government property exclusively." Id. at 10.

The record shows that the decision was sent on January 22 by certified mail to Hall at her Tucson, Arizona, post office box address, that notice was left on January 24, but that it was refused on March 5 and returned to BLM on March 17. Meanwhile, BLM had received Hall's January 25 letter. After further telefaxes and phone conversations, BLM sent another copy of its January 21 decision on February 24, which Hall received on March 5, the same date as her "refusal" of the copy mailed in January. In her notice of appeal dated March 31, Hall states: "I disagree with every aspect of these decisions."

Hall also telefaxed a letter to BLM dated March 31 stating that she was no longer offering to remove the structures BLM refers to as the White Swan cabins or willing to pay for their removal. She asserts that there were never any structures on the White Swan claims, but that she did own structures on the Silver Swan claims that she named the Silver Swan structures. On April 8, Hall telefaxed another letter asserting that BLM had changed the names of the claims and asking how she could submit a plan under the new names and status "without BLM returning them to me in a legal manner." She asked whether BLM had done anything to prevent the public from using her place and whether the house and structures had been removed.

ARGUMENTS ON APPEAL

In her Statement of Reasons (SOR), Hall characterizes the options posed by BLM's January 21 decision as "hav[ing] to remove the White Swan, adopt-a-cabin, structures for you, or say they are mine again by putting in a plan saying they are." Asserting that BLM has refused to return her claims and structures, she states that she cannot comply with BLM's decision: "I can not dispose of structures I no longer own. I am not obligated to put in a plan concerning structures I no longer own, on mining claims you (BLM) have taken ownership of and later incorporated into your adopt-a-cabin program for the public[']s use." (SOR at 1.) She further asserts that BLM had told her that it changed the status of her claims to a designated public recreation site to accommodate its program under BLM's public recreation rules under 43 CFR Part 8365. Id. at 2.

She asserts that after it "took ownership," BLM "spent a long time removing everything of value, and modern conveni[e]nces" to make the structures fit the "story" that the structures were historic and had been abandoned years ago. Id. "After altering the structures for your purposes you moved a Sierra Club man into my house to change the expensive metal roof for a cheap cloth one that the wind has

already blown off, instead of repairing the metal one. It was set up as an old fashioned cistern system and my only source of water collection to benefit the claims." Id. at 2-3. As in this statement and in her many letters to BLM and in her submissions to this Board, Hall blames BLM and its volunteers for the destruction of her cabin. Hall argues that BLM now is the owner of the cabin after having "adopted" it, asserting that BLM has taken her property without due process of law. She has no intention to submit a plan of operations that would involve the cabin nor does she consider it her responsibility to remove it.

BLM contends that it is not the owner of the cabin, having "taken steps to remedy the situation by removing the cabin from the program and reiterating that the BLM recognized that the cabin was [Hall's] private property" in its July 29, 2002 letter. (Answer at 11.) BLM contends that this Board has no jurisdiction to address Hall's takings argument and that if Hall believes she is entitled to compensation for BLM's "adoption" of her stone house because of a taking, trespass, or some other legal basis, she may seek relief before a tribunal that has authority to consider such claims.

## ANALYSIS

BLM acknowledges its error in "adopting" the cabin. BLM clearly had no authority to give written authorization for others to use the cabin or the surface of Hall's pre-1955 claim without her consent, or to enter into an MOU with respect to it with third parties. See Nevada-Pacific Mining Co., 164 IBLA at 406. However, the issue in this case is whether BLM properly issued a NON that required her to provide a notice or plan of operations that would justify the presence of the structures on the claim or to remove them. There can be little doubt that we would have affirmed the NON had BLM issued it before adopting Hall's cabin. See Robert B. Wineland, 169 IBLA at 220. Thus, the only issue is whether BLM's "adoption" of the cabin relieved Hall of responsibility for it.

The only thing that is certain from this record is that Hall is confused about the nature of a mining claim and the rights it conveys to her as claimant. When she acquired the mining claim and structures in 1993, and she does claim that she purchased both, she obtained certain rights to mine and occupy the claim for mining purposes, subject to the rules at 43 CFR Subparts 3809 and 3715. [13/] Though it may be true that the cabin predates her acquisition, this does not mean that its placement on a mining claim was legal or grandfathered when she acquired it. She had no option to allow the cabin to "occupy" the site in the absence of specific mining-related activity that justified it under the regulations at 43 CFR Subpart 3715. As goes the

---

[13/] In her many internet writings, Hall contends that her mining claim is not subject to those rules because it is a pre-1955 claim. For the reasons addressed above, her understanding is wrong.

cabin, however, it does not follow that so goes the mining claim itself. Even if BLM had properly required removal of the cabin, this would not have affected her underlying right to conduct mining-related activities on the claim subject to compliance with BLM rules. Thus, to the extent Hall appears to believe that as a legal matter she was deprived of ownership of the Silver Swan mining claims by BLM's actions with respect to the cabin, she is mistaken. The files for the two Silver Swan mining claims show that they remain in effect with Hall as owner, and that she has never made any attempt to mine them. BLM's July 29, 2002, letter stated that BLM would not attempt to prevent camping, hiking or sightseeing in the area of her claims, presuming that any such efforts must be made by Hall. See, e.g., United States v. Curtis-Nevada Mines, Inc., 611 F.2d 1277 (9th Cir. 1980) (certain mining claims are open to recreational use). [14/]

It is also worth commenting on Hall's accusations that BLM destroyed or removed her personal property and appliances. As noted above, although the cabin was modified in connection with the Adopt-a-Cabin program, the record documents the fact that the cabin was vandalized and stripped of appliances and furniture before BLM first inspected it in 1997, and that Hall had let the cabin fall into disrepair. Hall admitted that this was true in her 1998 report to the Inyo County Assessor.

Nonetheless, Hall's concerns arising from BLM's incorporation of her cabin into its Adopt-a-Cabin program have merit. Although BLM has acknowledged that it erred in appropriating the cabin for public use in various letters to her, Hall legitimately questions whether BLM has done (or could do) enough to dispel the public perception that the cabin is available for public use. Though BLM claimed it would remove the quite large and visible sign publicly proclaiming that the cabin was available within the "Adopt-a-Cabin" program, some evidence suggests that the sign was not removed for months or longer. BLM never responded to Hall's repeated and legitimate expressions of concern about whether personal liability arising from the use to which the property was put by BLM might attach to her, although one would ordinarily expect that BLM would have considered such issues when its Adopt-a-

---

[14/] We note, however, that the Curtis-Nevada case involved claims that were subject to BLM's authority to manage the surface for recreational uses under 30 U.S.C. § 612(b) (2000) because they were located after July 23, 1955, while Hall's Silver Swan claims had been located previously. BLM had no authority to authorize recreation on her mining claims under the Adopt-a-Cabin program without her consent. We render no finding about the adverse effect on her mining rights and her right of possession created by BLM's authorizing recreation on the surface as that issue is not before us. The record contains internet postings by Hall in which, inter alia, she implies that she would physically be impeded from mining by recreational users. Even if the record proved the rampant public use of which she complains, we can make no finding that she was impeded from mining because there is no evidence in the record of an area on the claims Hall ever attempted to mine.

Cabin program was first developed and before an MOU for the first cabin in the program was ever signed by any BLM employee. Moreover, the record contains hundreds of pages of information posted on the internet about the cabin. We are unaware of any information posted by BLM advising the public that the cabin is not available, and BLM expressly refused to take measures to prevent public use at Hall's suggestion.[15/]

Nothing in the record suggests that BLM has taken adequate affirmative action (other than removal of the sign) that would dispel the public perception BLM created that the cabin is available for public use. Although BLM may have been correct in stating in its July 29, 2002, letter that "any person is responsible for taking care of his/her personal property on the public lands," the letter effectively made Hall solely responsible to take action to deter a public that BLM itself invited. Under these circumstances, and in view of Hall's clear statement of intent to not use the cabin in a manner reasonably incident to mining, we find that BLM may remove the cabin, but BLM cannot require appellant to remove it after having adopted it for public use.

Accordingly, we affirm BLM's finding in the NON that the cabin and other structures on the Silver Swan claim were not being used for any purpose reasonably incident to mining as required by 43 CFR 3715.2 and are therefore subject to removal. We reverse the NON to the extent that it makes Hall responsible for the removal of those structures.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision appealed from is affirmed in part and reversed in part as described above.

Lisa Hemmer
Administrative Judge

I concur:

James F. Roberts
Administrative Judge

---

[15/] It is worth noting as well that Hall herself may be responsible to some extent for continued perpetration of the view that the cabin was adopted, by her own seemingly incessant publication of such information on the internet.

IBLA 2004-204

APPEARANCES

Mary Louise Hall
P. O. Box 87215
Tucson, AZ 85754
FAX: 520-908-0426

Nancy Zahedi, Esq.
Assistant Regional Solicitor
U. S. Department of the Interior
2800 Cottage Way, Room E-1712
Sacramento, CA 95825
FAX: 916-978-5694