**ELECTRONICALLY FILED ON JUNE 13, 2008**

Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
307/ 632-5105 Telephone
307/ 637-3891 Telefax

Attorney for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LOUISE HALL and GLEN GOULD,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

Case No. 07-773C
(Judge Braden)

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION TO STAY LITIGATION**

COME NOW, the Plaintiffs, Mary Louise Hall and Glenn Gould, by and through their undersigned attorneys, and hereby files its brief in opposition to Defendant United States' Motion to Dismiss. In its Motion, the United States outlines three reasons that this Court does not have subject-matter jurisdiction over the claim raised in the Plaintiffs' Complaint. These reasons include inaccurate arguments that the Plaintiffs' takings claim is based upon a regulatory violation, that the issues presented to this Court for decision are issues that were resolved by the Interior Board of Land Appeals ("IBLA") and are therefore improperly raised here. These arguments are without merit. Further, the Defendant argues that this Court should dismiss the Plaintiffs' claim

because the Plaintiffs have not established a property right in the unpatented mining claim. While the Defendant's third argument is factually correct, the result of that argument should not be dismissal of the Plaintiffs' claim, but rather a stay of the present case while the Bureau of Land Management performs a mineral determination of validity, as outlined by this Court in Holden v. United States. See 38 Fed. Cl. 732, 735 (1997).

## I. STATEMENT OF FACTS

Plaintiffs filed this lawsuit against the United States on November 5, 2007, alleging the taking of private property by the United States of America California Bureau of Land Management Ridgecrest Field Office ("BLM") through its "Adopt-a-Cabin" program. The name of the program has subsequently been changed to the Historic Cabin Site Stewardship program.

On November 3, 2001, the BLM signed a Memorandum of Understanding ("MOU") pursuant to the Adopt-a-Cabin program, incorporating into the program the physical structures currently owned by Plaintiff Glenn Gould, located on the Silver Swan unpatented mining claim owned by Plaintiff Mary Louise Hall. The MOU also stated that the Silver Swan mining claim was not an active mining claim and that there is no mining claimant. By virtue of including the unpatented mining claim in the Adopt-a-Cabin program, the BLM effectively denied Plaintiff Mary Louise Hall access to her Silver Swan mining claim for mining purposes, allowed the public to trespass on the claim, and allowed the public to remove her mining equipment and minerals and gemstones.

Further, by including the physical structures on the Silver Swan mining claim in the Adopt-a-Cabin program, the BLM denied Plaintiff Glenn Gould the use of his structures, allowed the public to trespass in the structures, and then took no action to notify the public that these structures were not public property even after the BLM acknowledged that the Silver Swan mining claim and structures should never have been included in the Adopt-a-Cabin program in the first place.

Plaintiff Louise Hall purchased the Silver Swan mining claim in 1993.[1] At the time she purchased the claim, she also acquired the structures, including a house, a garage, three sheds, and two additional structures located on the property. At the time the structures were acquired in 1993, their presence could be justified only if they were "reasonably incident to mining." However, under the Mining Occupancy and Use Regulations, 43 C.F.R. Subpart 3809, unless the mining on the property exceeded "casual use," the claimant was not required to notify the BLM of mining activities on the property. These regulations allowed Hall's structures to be present on the unpatented mining claim.

In 1996, the BLM issued regulations under 43 C.F.R. Subpart 3715 which required Hall to notify the BLM of the extent of her occupancy of the structures and to establish that such occupancy was "reasonably incident to mining." "Occupancy" encompassed the construction, presence, or maintenance of temporary or permanent structures. See Pilot Plant, Inc., 168 IBLA 201, 214-14 (2006). Claimants were required

[1] At the same time that Hall purchased the above-discussed Silver Swan claim, she also purchased the Silver Swan #1 mining claim, claim #CAMC 49333, and the White Swan #1-#10 mining claims, claim numbers 49334 through 49343. As discussed below, the White Swan mining claims were forfeited in 2001 for failure to pay the maintenance fees. None of the claims discussed in this footnote are subjects of this litigation.

to notify the BLM by October 15, 1996, and were required to comply with the requirements of Subpart 3715 by August 18, 1997. Hall did not notify the BLM of her occupancy on the claims nor did she establish that the structures were incident to mining.

For this failure, the BLM properly could have engaged in some form of enforcement action under 43 C.F.R. § 3715.7-1 including the issuance of a notice of non-compliance ("NONC") requiring Hall to bring her occupancy into compliance with the Subpart 3715 regulations. However, the BLM failed to issue such NONC. Instead, the BLM sought Hall's permission to incorporate the structures into its Adopt-a-Cabin program which would open the structures to public use.

In February 1999 and again in March 1999, the BLM contacted Louise Hall and asked her to sign an MOU which would place the structures into the Adopt-a-Cabin program. Hall refused. In September 1999, the BLM again contacted Hall and asked her to quitclaim deed the house and other structures on the Silver Swan mining claim to the BLM so that the BLM could enter the structures into the Adopt-a-Cabin program.

On November 21, 2000, the BLM published amendments to its regulations at 43 C.F.R. Subpart 3809 which provided that the occupancy of structures on mining claims could only lawfully continue after January 21, 2001 if the owner of the mining claims filed a notice of intent or a plan of operations under 43 C.F.R. Subpart 3809. In June 2001, Hall forfeited ownership of some of her other mining claims, discussed *supra* in footnote no. 1., for failure to pay maintenance fees for the 2001 assessment year by September 1, 2000, as required under 30 U.S.C. § 28f(a).

However, the BLM mistakenly concluded that the structures on the Silver Swan mining claim were on the White Swan claims which had been forfeited. Thus, on November 3, 2001, the BLM entered into a MOU with certain volunteers, namely the Sierra Club, entering the structures on the Silver Swan mining claim - still owned by Hall - into the Adopt-a-Cabin program. This MOU was signed by Steve Smith, the Adopt-a-Cabin Program Manager from the BLM Ridgecrest Field Office in California. The MOU fails to state anything about the ownership of the structures although it does not say that there is no mining claimant nor mining claim on the property. Hall did not receive a copy of the MOU at the time that it was signed.

Once the MOU was signed, and under the terms of that MOU, the BLM authorized the public's use of the structures for overnight camping, meetings or other activities related to casual use mining. The MOU also allowed casual use mining on the unpatented mining claim itself. Signs were placed on the property which stated that the property was part of the Adopt-a-Cabin program. These signs contained the symbol or seal of the BLM.

In 2002, Hall sold the structures located on the Silver Swan mining claim to Glenn Gould. As stated above, at the time of the sale, neither Glenn Gould nor Louise Hall were aware that the structures had been incorporated into the BLM's Adopt-a-Cabin program.

Under the BLM's Adopt-a-Cabin program, BLM volunteers removed Hall's personally-owned mining equipment used for mining gemstones for jewelry from the unpatented mining claim. This equipment consisted of:

a. Steel welded bat cages and locks from mining tunnels and mining shafts. These cages and locks were placed on the opening of the mine to stop private trespass on the property;

b. Mining shaft and tunnel shoring;

c. Equipment and supplies for the full production of jewelry and sculptures;

d. Mineral beads and findings;

e. 400 pounds of cut and polished gemstones, 200 pieces of finished gemstones and beaded jewelry, one ton of slabbed and blocked onyx, 20 marble tabletops, additional marble and soapstone sculptures;

f. One small trencher, one gasoline engine concrete mixer, 2,500 gallon water storage tank, 4-55 gallon barrels for water storage, batteries and generators, solar panels, three ore carts and tracks, stone setting and jewelry making equipment, saws used for quarrying stone, various sized core drills, other additional equipment related to mining, and mineral product finishing.

The estimated value of the taking of the unpatented mining claim and mining equipment is $280,000.00.

Further, under the Adopt-a-Cabin program, the BLM volunteers entered into Gould's structures and gutted them to fit the mining period perception including the roof and all personal possessions that remained inside of the structures. The estimated value of the taking of Gould's structures on Hall's unpatented mining claim is approximately $907, 310.00.

On July 29, 2002, the BLM admitted that Gould's structures on Hall's unpatented mining claim had been mistakenly entered into the Adopt-a-Cabin program and that it had erected the Adopt-a-Cabin signs in error. However, the BLM failed to remove all of signs from the unpatented mining claim designating the structures as part of the Adopt-a-Cabin program nor did the BLM make any effort to dispel the notion that property was open to the public and was a BLM-managed public recreation site.

On March 4, 2004, Hall received a NONC regarding the structures on the mining claim. The BLM determined that the structures did not comply with the regulations under 43 C.F.R. Subpart 3715 because they were not being used for purposes reasonably incident to mining. The NONC provided for a thirty day period to demonstrate that the structures were needed for mining operations or else they were to be removed by the owner. When neither Hall nor Gould responded, the BLM issued a cessation order ("CO") on April 21, 2004, which mandated that Hall cease maintaining her claims on public land.

Hall informed the BLM that the structures on her unpatented mining claim had been sold, but that she had power of attorney to speak on behalf of the owner of the structures, Gould. On March 31, 2004, Hall administratively appealed the NONC and the CO to the IBLA. The issue before the IBLA was whether the BLM's adoption of the structures into the Adopt-a-Cabin program relieved Hall or Gould of liability for the structures.

The IBLA held that the structures on the Silver Swan mining claim were not being used for any purpose reasonably incident to mining and were therefore subject to removal. See Mary Louise Hall, IBLA 2004-204, *16 (2004). However, the IBLA stated

that the BLM was responsible for removing the structures from the property due to the BLM's non-compliance with 43 C.F.R. Subpart 3715. See id. Further, the IBLA ruled that it was not Hall's responsibility to deter the public from her unpatented mining claims since the BLM had invited the public use of the property. See id. The IBLA also noted that Hall had a legitimate question as to whether the BLM had done enough to dispel the public perception that her property was available for public use. Id. at *15. Additionally, it found that the BLM had failed to remove the Adopt-a-Cabin signs placed on the mining claim and that the BLM failed to post information advising the public that the site was not available for public use. See id.

It is the Plaintiffs' understanding that, to date, volunteers still frequent the mining claim and even engage in mining activities on the claim. It is also the Plaintiffs' understanding that the volunteers have dug new mining tunnels on Hall's unpatented mining claim. Although the BLM eventually removed the Adopt-a-Cabin signs from the mining claim, it has taken no further action to dispel the notion that the structures and mining claim are open to the public for public use.

Hall has attempted to mine her claim since the BLM's entrance of the property into the Adopt-a-Cabin program. In her attempts, she has been subject to abuse by the volunteers when attempting to access her claim and has even been shot at. Additionally, Hall has been unable to find help for her mining operations due to the public perception that the Silver Swan mining claim is a public recreation claim. Hall's mining equipment has also been removed from the site.

Since the IBLA ruling, the BLM has burnt and bulldozed the structures owned by Gould on the Silver Swan mining claim. At the same time, the BLM placed at least 8 feet

of dirt and rocks on top of Hall's Silver Swan claims blocking access to the clay, silver and rare earth minerals. The dirt and rocks placed on Hall's claims were not from Hall's property. Previously a fire had been set in the silver shaft and tunnels on the claim, ruining the shoring and making the tunnels inaccessible.

As Hall's unpatented mining claim was located prior to 1955, she is entitled to exclusive possession over the surface of the property, and she has the authority to exclude the public from her property.

## II. ARGUMENT

### A. Standard of Review

Subject matter jurisdiction is "an inflexible threshold matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006). In considering a motion to dismiss for either lack of subject matter jurisdiction or failure to state a claim, the Court construes all allegations in the light most favorable to the non-moving party. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The Court must presume that the undisputed factual allegations included in the complaint are true. See Reynolds v. Army & Air Force Exhc. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988).

The Court of Federal Claims is a court of limited jurisdiction. See Jentoft v. United States, 450 F.3d 1342, 1349 (Fed. Cir. 2006). The scope of this Court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. See United States v. King, 395 U.S. 1, 4 (1969). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." Id.

The Tucker Act, 28 U.S.C. § 1491, confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Id. at §1491(a)(1). In order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. See Greenlee County, Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007). The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v . United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994).

### B. Plaintiffs' Taking Claim Is Not Based Upon A Regulatory Violation

Contrary to the United States' allegations in its Motion to Dismiss, Plaintiffs' taking claim is not based upon a regulatory violation. Rather, the issue presented to this Court is whether the BLM's affirmative inaction in failing to correct its "mistake" of including the structures and unpatented mining claim owned by the Plaintiffs was a takings pursuant to the Fifth Amendment of the United States Constitution.

In fact, it is not necessary for this Court to determine whether the actions of the BLM in placing the Plaintiffs' property within the Adopt-a-Cabin program were in accordance with its regulations. Plaintiffs' agree that, *if* they were challenging the legality of the BLM's programs, this would not be the correct venue. However, instead,

Plaintiffs are asking this Court to determine that *once the BLM acknowledged that it was mistaken in placing the property in the program*, it then committed a takings of the Plaintiffs' property by failing to affirmatively take action to correct its mistake. Through the inaction of the BLM, the public still trespasses on the Plaintiffs' property, and prohibits Plaintiff Hall from making use of her unpatented mining claim. However, regardless of the authority under which the BLM took the Plaintiffs' property, the Plaintiffs acknowledge that the taking is a legal reality, and in this action, seek just compensation. See Osprey Pacific Corp. v. United States, 41 Fed. Cl. 150, 157 (1998).

In Osprey, this Court acknowledged that once a plaintiff brings an action in this Court, that plaintiff "may only seek just compensation since the Fifth Amendment allows the government to take property with few limits, only, however, it must pay for that property at the market value." See id. This Court went on to hold:

> The fact that a plaintiff may have another remedy against the government, namely reversing the seizure action in a district court, has never been held to be a defense to an action in this court. In fact, it is quite the opposite, as the Supreme Court noted in Preseault v. Interstate Commerce Commission, "takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act. . . . The Tucker Act provided jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation or an express or implied-in-fact contract." Thus, a remedy in the district court may be conditioned on the failure of a just compensation remedy in this court.
>
> In the familiar law school property hypothetical, the rightful property owner may elect at his or her option to treat the thief as a purchaser, thus electing the contract over the tort remedy. . . . It is hardly a defense for the government to say it was wrong. A plaintiff may elect to come to this court for monetary damages as long as they are not challenging the government's actions.

Id. In this action, Plaintiffs are not seeking to have this Court determine if the BLM was in violation of its regulations when it took the Plaintiffs' property. Rather, Plaintiffs seek just compensation for the property that was taken by that agency.

The United States points to several places within the Plaintiffs' complaint that it asserts would deprive this Court of jurisdiction, because the Plaintiffs' state that the BLM was in violation of its own regulations. Plaintiffs would be happy to amend its Complaint to clarify these issues, should this Court deem it necessary to do so. See Foman v. Davis, 371 U.S. 178, 182 (1962) (whether to grant leave to amend complaint lies within Court's discretion); see also Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991) ("a court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."). However, the fact remains that whether BLM's actions were lawful or not, Plaintiffs have been deprived of the use of their property, thus just compensation is due.

### C. Plaintiffs Are Not Asking This Court To Overturn the IBLA's Decision

The United States also asserts that Plaintiffs are asking this Court to "reach a conclusion in direct conflict with the IBLA's holding." See Motion to Dismiss at 7. Plaintiffs are not asking the Claims Court to overturn the IBLA decision. The IBLA specifically did not rule on the validity or legality of the Adopt-a-Cabin program, see Mary Louise Hall, IBLA 2004-204 at n.9, and the Plaintiffs do not ask this Court to make a decision upon that issue either. Rather, the issue before this Court is whether the BLM's affirmative inaction after concluding that it had mistakenly placed the mining

claim and structures in the Adopt-a-Cabin program resulted in a takings of the Plaintiffs' property.

The United States argues that because the IBLA determined that the Plaintiffs had no right to maintain the cabins or other structures on the mining claim, this Court could not find that the BLM took the Plaintiffs' property without just compensation without making a ruling contrary to the IBLA's ruling. See Motion to Dismiss at 8. This is not the case. At a minimum, there was a temporary takings of the Plaintiffs' property from the induction of the Plaintiffs' property into the Adopt-a-Cabin program in 2001 until the IBLA's decision in 2007.[2] Over this six-year period, and since then, Plaintiffs have been unable to enjoy and utilize their property. Therefore, this Court can find that there was a takings of the Plaintiffs' property *without* issuing a contrary ruling to that of the IBLA.

**D. Although A BLM Mineral Determination of Validity Has Not Occurred, That Is Not Cause For Dismissal, But Rather Cause To Stay This Case Pending Such Determination**

The United States is correct in asserting that "to have a compensable interest in unpatented mining claims sufficient to bring a taking action in this Court, there must have been a determination as to the validity of those mining claims." See Holden v. United States, 38 Fed. Cl. 732, 735 (1997). However, the remedy when a mineral determination of validity has not occurred should not be dismissal, but rather a stay of

[2] As stated above, since this case was filed, the Blm has burned and bulldozed the structures as allowed by the IBLA opinion. The BLM also placed dirt, rocks and debris on top of the claims burying the clay, silver and rare earth minerals, with worthless dirt. A fire has been set in the silver shaft and tunnels ruining the shoring and making the tunnel inaccessible.

the litigation while the BLM conducts a mineral determination of validity. See id. at 736.

Although Plaintiffs believed at the time of the submission of their Complaint that a mineral determination of validity had been conducted, they have since found out that it is not the case. Rather, a mineral survey of the claims has been conducted, but not a mineral determination of validity.

In Holden, this Court discussed that the determination of the validity of unpatented mining claims is entrusted to the BLM. See id. at 735. In that case, as it should here, this Court determined that "a stay of the proceedings in this case is warranted until the BLM has determined the validity of the plaintiffs' mining claims, and the parties have complied with all of the administrative procedures related to that determination." See id. at 736. Plaintiffs therefore request that this Court stay this litigation until the BLM has determined the validity of the Plaintiffs' mining claims, and the parties have complied with all of the administrative procedures related to that determination.

## III. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court DENY the Defendant's Motion for Summary Judgment. Further, Plaintiffs respectfully request that this Court STAY the current litigation pending the outcome of a BLM mineral determination of validity.

RESPECTFULLY SUBMITTED this 13th day of June, 2008.

/s/ Karen Budd-Falen
Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, WY 82003-0346
307/632-5105 Telephone
307/637-3891 Telefax
karen@buddfalen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of June, 2008, I filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to the following:

Loren Misha Preheim misha.preheim@usdoj.gov

/s/ Karen Budd-Falen
Karen Budd-Falen